# IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF MISSOURI
## CENTRAL DIVISION

MARY KING,                  )
                                  )
               Plaintiff,        )
                                    )
        v.                    )      Case No. 05-4235-CV-C-NKL
                                    )
RUSSELL HARDESTY and   )
COLUMBIA PUBLIC SCHOOL DISTRICT   )
                                    )
               Defendants.     )

## ORDER

Plaintiff Mary King ("King") has filed a four-count Complaint against the Columbia Public School District ("the District") and Dr. Russell Hardesty ("Hardesty"). In Counts I, II and III, King asserts claims against the District for race discrimination, hostile environment and retaliation pursuant to Section 1981. In Count IV, King asserts a claim against both the District and Hardesty for race discrimination, hostile environment, retaliation and violations of equal protection pursuant to Section 1983. Pending before the Court is Defendants' Motion for Summary Judgment [Doc. 53]. For the reasons stated herein, the motion will be granted.

Related to Defendants' Motion for Summary Judgment and also pending before the Court are four motions to strike: Plaintiff's Motion to Strike Report of Calvin A. Keller, CPA [Doc. 65]; Plaintiff's Motion to Strike Bobbie Pauley Affidavit Paragraphs 9 and 10 [Doc. 66]; Plaintiff's Motion to Strike Defendants' Exhibits Submitted with

1

Defendants' Reply Brief in Support of Defendants' Motion for Summary Judgment [Doc. 86]; and Defendants' Motion to Strike References to the Depositions of Hope Quaintance and Louis Gatewood in the Plaintiff's Memorandum in Opposition to the Defendants' Motion for Summary Judgment [Doc. 70].

**MOTIONS TO STRIKE**

**I.     Plaintiff's Motion to Strike Report of Calvin A. Keller, CPA and Plaintiff's Motion to Strike Bobbie Pauley Affidavit Paragraphs 9 and 10**

King moves the Court to strike the Keller report because Keller was not disclosed as an expert witness and because it is unreliable.  Defendants claim Keller is giving lay testimony and is not being offered as an expert.  The report in question is a simple compilation of information pertaining to telephone calls placed to King by the Sub-Finder computer program.  Sub-Finder is the District's automated computer calling program used to contact potential substitute teachers.  In their Motion for Summary Judgment, Defendants argue that King "rejected many more jobs than she accepted."  [Defs' Mot. at 23.]  In the report, the District submits an analysis of job call logs, which, according to the District, evidence that King was offered, but did not accept, hundreds of substitute teaching jobs.  King disputes the accuracy of this analysis and states that many of her work days are unaccounted for in the call logs.  Furthermore, some of the job call logs showing that King rejected or did not respond to substitute teaching opportunities reflect multiple calls made on the same day.  Given the current state of the record, the Court will strike Keller's report.  Defendants have failed to lay an adequate foundation for its

2

admission.

King also moves the Court to strike paragraphs 9 and 10 of Pauley's affidavit. Because the Court will not consider Keller's report in deciding the summary judgment motion, it need not rule on Plaintiff's Motion to Strike Bobbie Pauley Affidavit Paragraphs 9 and 10. The motion is denied as moot.

## II.      Plaintiff's Motion to Strike Defendants' Exhibits Submitted With Defendants' Reply Brief in Support of Defendants' Motion for Summary Judgment

In her motion, King asks the Court to strike 11 exhibits submitted by Defendants with their reply brief in support of their summary judgment motion. King argues the exhibits should be struck because the submissions evidence (1) Defendants' disregard for Fed. R. Civ. P. 26(a) and 26(e) and the Court's Scheduling Order and (2) the exhibits are inconsistent with documents previously produced during discovery. Defendants claim the documents were recently discovered on a former employee's hard drive.

After reviewing the parties' briefs, the Court finds that the exhibits were produced when found and there is no evidence of bad faith on the part of Defendants. To the extent Defendants' exhibits are inconsistent with documents previously produced, the Court will consider them in the context of summary judgment standards. Accordingly, Plaintiff's motion will be denied.

## III.     Defendants' Motion to Strike References to the Depositions of Hope Quaintance and Louis Gatewood in the Plaintiff's Memorandum in Opposition to the Defendants' Motion for Summary Judgment

Defendants move the Court to strike certain references to the depositions of Hope

Quaintance and Louis Gatewood, which were taken in a prior proceeding. Defendants claim the parties had a verbal agreement that such deposition references would not be used in this proceeding. Plaintiff's counsel disputes that the parties had any such agreement, but voluntarily struck some of the disputed references. The Court considered the remaining references when ruling on Defendants' Motion for Summary Judgment. Because summary judgment will be granted to Defendants, Defendants suffer no prejudice from the inclusion of these references. Accordingly, Defendants' motion will be denied as moot.

**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

I.      **Background**[1]

    A.      **King's Employment from July 1, 2001 to December 7, 2001**

Mary King is an African-American who was formerly employed by the District. She has bachelor's and master's degrees in criminal justice, and, at all times relevant to this lawsuit, was certified by the State of Missouri as a substitute teacher.

The District initially hired King as a summer school substitute teacher. She started work on July 1, 2001. Her job was to work as a substitute teacher with a single homebound student, H.S. In the fall of 2001, H.S. was enrolled at the Bearfield School

---

[1] To resolve the motion for summary judgment, the Court considers only those facts that are material and relevant. This factual overview contains both contested and uncontested facts. When contested, the facts are viewed in the light most favorable to King, the nonmoving party.

("Bearfield").[2]  King worked one-on-one with H.S. for approximately four hours each day from August 29, 2001 until December 7, 2001.  Working with H.S. was not always easy.  On one occasion, H.S. assaulted King at the school.

In early September 2001, Director of Substitute Personnel Bobbie Pauley ("Pauley") told King that she was a long-term substitute while she worked at Bearfield.  A long-term substitute is paid more than a regular substitute according to Columbia Public School Policy, which provides that "Teachers continued in substitute employment for more than ten (10) consecutive days in any one full-time assignment shall be paid for all days at a rate based on the current teacher salary schedule."  (See Laffey Affidavit Attachment.)  This policy, however, only applies to fully certificated teachers.  Though King is a certified substitute teacher, she is not a fully certificated teacher.  To be licensed as a fully certificated teacher by the State of Missouri, an individual must have at least 120 hours of college credit and a bachelor's degree in education.  King's degree is in criminal justice, not education.  In contrast, Cynthia Ryan ("Ryan"), a substitute teacher at Bearfield who had a bachelor's degree in education, was fully certificated and therefore paid as a long-term substitute.[3]

---

[2] Bearfield is a small school within the District with 30 to 35 students.  Bearfield students are unable to function in regular classrooms.  At the school, students receive educational and behavioral instruction.  Most Bearfield students have an Individualized Education Plan; approximately 50 percent of Bearfield's students are medicated; and some Bearfield students are physically aggressive.  Bearfield's goal is to modify a student's behavioral or educational problem so the student may return to a regular classroom.

[3] The parties do not agree on whether Ryan was a provisionally certified teacher or a fully certified teacher.  Because there is no evidence that a provisionally certified teacher was to

H.S. was eventually assigned to Ryan's regular classroom and King's employment as a substitute teacher was terminated.

### B.     King's Employment After December 7, 2001

After her employment at Bearfield ended, King sought other employment opportunities with the District including home school communicator positions, homebound instructor assignments and substitute teaching assignments.

### 1.     Home School Communicator Positions

Though King was eligible, she was not granted a home school communicator position during the 2002-2003, 2003-2004 or 2004-2005 school years. On March 15, 2002, Pauley typed a note that Dr. Mary Laffey ("Laffey") (Director of Human Resources) wanted King "deep-six[ed]." [Pl's SOF ¶ 120.]

### 2.     Homebound Instructor Assignments

The District's Department of Special Services facilitates homebound instruction. Though not always possible, the District's policy was to assign a student's teacher to be the student's homebound instructor.

Prior to the 2003-2004 school year, Hardesty, either personally or through his secretary, assigned homebound instruction hours for the District. King applied for and was assigned homebound instruction hours during the first half of the 2001-2002 school year.

---

be treated as non-certified by the District, the distinction makes no difference for purposes of this Summary Judgment Motion.

It is undisputed that King was qualified to become a homebound instructor. However, beginning with the 2002-2003 school year, anyone who was not a student's teacher was required to submit an application to become a homebound instructor.

### 3.    Substitute Teaching Assignments

After King finished her work with H.S. at Bearfield, she continued to substitute teach for the District. She substituted 19 days during the 2001-2002 school year, 67 days during the 2002-2003 school year, 28 days during the 2003-2004 school year, 11 days during the 2004-2005 school year, and eight days during the 2005-2006 school year. King applied every year to be considered for a permanent substitute teaching position.

In order to substitute teach, one must be on the "All Substitute List," which is controlled by Laffey. Once on the list, substitute teachers are offered assignments via telephone or they may call in to check on assignments.

King received numerous complaints as a substitute teacher. In January 2002, King had a "run in with a social worker intern in front of the students." [Defs' Reply at 11.] She also seemed "power hungry." [Defs' Reply at 11.] Between February 2002 and 2003, complaints indicated that King overstepped her bounds by calling parents, never asked for permission before she did anything, inappropriately confronted fellow teachers and staff, told students at one school that they would get Hepatitis from the drinking water, and told students that their regular teacher was pregnant when she was not. These and other complaints resulted in seven schools banning her from substitute teaching at their facility, including two of the District's three junior high schools as well as a large

7

high school.  Other substitute teachers, including Caucasians Lisa Hackett ("Hackett")

and Shirley Forester ("Forester"), also received complaints.  Hackett and Forester were

both excluded from more than seven schools.  Hackett and Forester received more

substitute teaching assignments than did King.

During the summer of 2003, Pauley decided not to invite King to the substitute

teacher reactivation meeting.  Pauley said her decision was based on King's past

performance.  After learning that she was not invited to the meeting, King met with

Laffey on September 4, 2003.  Laffey wrote in her notes that King was "aggressive,

assertive" and "if any exclusions, we are done," meaning that if any additional schools

banned King from their facility, then King would no longer be given substitute teaching

assignments.  [Pl's SOF ¶ 122.] Although Laffey decided that King would be granted a

second chance and allowed to substitute teach in elementary schools during the upcoming

school year, King's name was not included on the substitute list from August 19, 2003 to

September 12, 2003.  (Ex. 57.)

### 4.    Fellowship Opportunities

In the spring of 2002, King informed Laffey that she would like to be considered

for a fellowship to become a certified teacher.  Laffey referred King to Columbia College.

At the college, King learned the fellowships were only for people who the District was

going to hire. King reported this information to Laffey, and Laffey informed her that the

District would not hire her.

In 2003, King again requested and was denied the fellowship.

## C.    Hardesty's Comments

As Bearfield site administrator, Hardesty was King's supervisor during the five months she worked at Bearfield.  During those months, Hardesty maintained an arrogant and insulting demeanor toward King and on multiple occasions made racial comments.[4] Hardesty once told King that his family had been slave holders, and King heard him refer to male African-American employees as "big black bucks" and "my boys." [Pl's SOF ¶ 30.]  Hardesty once came into King's room and asked how King felt about the word "nigger."  When asked why he would use the word in King's presence, Hardesty's response was that "he runs the school.  He can say anything he wants."  [Pl's SOF ¶ 32.] On another occasion, Hardesty entered King's classroom and, in the presence of her student, asked King if "she had white in her blood."  [Pl's SOF ¶ 34.]  Hardesty also told racially insensitive jokes in King's presence.  When asked to stop, he would, but thereafter would repeat the jokes.  On a separate occasion, Hardesty asked King if she dated white men stating, "Once you go black, you never go back."  [Pl's SOF ¶ 34.]

Hardesty told King that "white people teach black kids . . . better than someone from their own race." [Pl's SOF ¶ 36.] Hardesty and Dale Wilkinson ("Wilkinson") (a supervisory employee) referred to African-American children and students as "ghetto kids."  [Pl's SOF ¶ 40.] Hardesty also referred to African-American children and students as "pickaninnies," "jezebels," and "crack babies."  [Pl's SOF ¶¶ 38-39, 42.] Furthermore,

---

[4] Hardesty denies that he made any inappropriate comments.  For purposes of summary judgment, the Court must view the evidence in the light most favorable to the plaintiff.

9

Hardesty referred to African-American students as "animals," "young criminals," "jail bait" and "ignorant misfits." [Pl's SOF ¶ 41.] He also said the students needed to be in cages, needed to have some sense whipped into them, and were "going to end up in jail [where they] would be someone's bitch." [Pl's SOF ¶ 41.] Hardesty never made similar comments or posed similar questions to white students, teachers or staff. Wilkinson would often laugh at Hardesty's racially insensitive statements. King asked Hardesty how he could call the kids these names and Hardesty responded, "I can run that school any way I want to. No one questions my actions because I am the administrator, and, I can run it any damn way I please." [Pl's SOF ¶ 41.] All of these comments were made either to or in the presence of King. King found all of these comments offensive.

### D.    King's Complaints

King often complained about Hardesty's comments. On numerous occasions during the fall of 2001 she complained directly to Hardesty about his use of racially insensitive language. She made similar complaints about Hardesty to Laffey in February 2002 and to Beulah Ralph ("Ralph") sometime during 2002. King complained about not getting jobs with the District during the summer and fall of 2003 and in an August 20, 2005 letter sent to Pauley, Dr. Phyllis Chase ("Chase") (superintendent of the District) and Laffey. In addition, King believed Hardesty used excessive force when restraining some students and, in the fall of 2001, reported her belief to the District.

She also often complained about unequal treatment at Bearfield. Specifically, King complained that she was not given a computer password to the District's computer

10

system during the few months she worked at Bearfield. Bearfield staff members could request user names and passwords through Instructional Media Services, whose forms were available on-line. King was eventually given a working password in 2005. In addition, King, who arrived at Bearfield after the school day began and left before it ended, was never given a key to the school. She also did not have access to the office where supplies and the copy machine were located. King asked for keys, but was told there were not enough keys for everyone. The copy machine was eventually moved to a location where all teachers and staff had easy access to it.

## II. Discussion

### A. King's Race Discrimination Disparate Treatment Claims

King claims the District discriminated against her when it (1) failed to pay her the salary of a long term substitute teacher, (2) terminated her from her position as a substitute teacher at Bearfield, (3) denied her homebound instructor assignments, and (4) denied her substitute teaching assignments from the spring of 2002 through October 31, 2005.

King may survive Defendants' Motion for Summary Judgment on these claims in one of two ways. First, King may offer proof of "direct evidence" of discrimination. *Griffith v. City of Des Moines*, 387 F.3d 733, 736 (8th Cir. 2004). Second, even if King lacks direct evidence of discrimination, she may avoid summary judgment by "'creating the requisite inference of unlawful discrimination' through the familiar three-step burden-shifting analysis originating in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.

11

Ct. 1817, 36 L.Ed.2d 668 (1973)."  *Russell v. City of Kansas City, Missouri*, 414 F.3d 863, 866-67 (8th Cir. 2005) (quoting *Griffith*, 387 F.3d at 736).

### 1.    Direct Evidence

Direct evidence is evidence that links the alleged discriminatory attitude and the adverse employment action in such a way that a reasonable fact finder could conclude "that an illegitimate criterion actually motivated the adverse employment action." *Griffith*, 387 F.3d at 736 ("'[D]irect' refers to the causal strength of the proof, not whether it is 'circumstantial' evidence."); *Thomas v. First Nat'l Bank of Wynne*, 111 F.3d 64, 66 (8th Cir. 1997).  Some comments can reflect a decision maker's discriminatory attitude while still not supporting an inference that the decision maker's discriminatory attitude caused an adverse employment action.  *Browning v. President Riverboat Casino-Missouri*, 139 F.3d 631, 635 (8th Cir. 1998) ("Direct evidence does not include stray remarks in the workplace, statements by nondecisionmakers, or statements by decisionmakers unrelated to the decisional process itself."  (quotation omitted)).

In this case, Hardesty is a decisionmaker with respect to homebound instruction hours and King's teaching position at Bearfield, and viewing the evidence in the light most favorable to King, he did direct offensive racial remarks at King.  However, evidence has not been submitted that Hardesty was a decisionmaker with respect to any other positions sought by King or that Wilkinson was a decisionmaker with respect to any positions at all.  Though Hardesty's comments were undeniably crude and unprofessional, nothing in the record creates an inference that his racial animus motivated any adverse

12

employment action suffered by King.

King's argument in opposition to Defendants' Motion for Summary Judgment relies in large part on the Eighth Circuit's opinion in *Browning*. In *Browning*, the court found that an African-American supervisor's reference to the Caucasian plaintiff as "that white boy" was made in the context of the plaintiff's employment and warranted an inference that race was a motivating factor in the supervisor's decision to terminate the plaintiff. *Browning*, 139 F.3d at 635. Specifically, after a meeting with the plaintiff, the supervisor stated "that white boy better learn who he's messing with, he better get his act together." *Id*. at 633-34. Unlike the facts in *Browning*, nothing in this case suggests that Hardesty's inappropriate comments motivated any actions with respect to King's employment. King claims that Hardesty once told her that "white people teach black kids . . . better than someone from their own race." [Pl's SOF ¶ 36.] King does not indicate whether this statement was made before or after she suffered an adverse employment action for which Hardesty was responsible. Even if she had indicated that Hardesty made this particular comment prior to the adverse employment action, Hardesty's comment is not direct evidence that King was not assigned homebound hours or terminated because of her race. On its face, the comment is a general one that is not specific to King. Even if Hardesty maintained this belief, he must have also believed that King was an acceptable teacher or else he would not have hired her just a few months earlier. King has provided no evidence that this comment by Hardesty was in some way connected to King's employment.

13

The strength of King's causal evidence is not sufficient to be characterized as "direct."

### 2.    The *McDonnell Douglas* Analysis

The first step in the familiar *McDonnell Douglas* burden shifting framework requires a plaintiff to make out a prima facie case. To establish a prima facie case of race discrimination under Section 1981, King must show (1) she is a member of a protected class, (2) she was qualified for the positions of homebound instructor and substitute teacher, (3) she suffered an adverse employment action, and (4) some evidence that would allow the inference of improper motivation. *Barge v. Anheuser-Busch, Inc.*, 87 F.3d 256, 258 (8th Cir. 1996).

Once a plaintiff has made a prima facie case, there is a presumption of discriminatory conduct by the employer. The employer may shift the burden back to the plaintiff by presenting a legitimate, non-discriminatory reason for its conduct. *Haas v. Kelly Services, Inc.*, 409 F.3d 1030, 1035 (8th Cir. 2005) (citations omitted) (setting forth the burden-shifting framework). At this stage of the proceeding, the employer bears only the burden of production, not the burden of persuasion. *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089 (1981). If the employer satisfies its burden of production, then the presumption of unlawful conduct disappears and the plaintiff is required to prove by a preponderance of the evidence that the employer's stated reason was pretext for unlawful conduct creating an inference that discrimination was the true reason. *Haas*, 409 F.3d at 1035.

14

### a. Long-Term Substitute Teacher Salary

Because King has not shown that she was qualified for the long-term substitute teaching designation, her claim must fail. Columbia Public School policy provides that "Teachers continued in substitute employment for more than ten (10) consecutive days in any one full-time assignment shall be paid for all days at a rate based on the current teacher salary schedule." (See Laffey Affidavit Attachment.) King claims that she should have been paid according to this policy and was denied that pay because of her race. The Columbia Public School policy applies only to certificated teachers. King is a licensed substitute teacher, but not a certificated teacher because her degree is in criminal justice, not education.[5]

King counters that she was told by Bobbie Pauley, Director of Substitute Personnel, that she was a long-term substitute teacher. Notwithstanding Pauley's statement, King has provided no evidence that the District's interpretation of the policy is incorrect. Pauley, though Director of Substitute Personnel, did not have the authority to change King's employment designation contrary to District policy. Therefore, the District's motion is granted as to this issue.

### b. King's Termination

For purposes of summary judgment, the Court will assume that King has proved her prima facie case that the District discriminated against her when she was terminated

_____

[5] King claims that Cynthia Ryan was not certified but the facts show that she was, albeit provisionally.

from her position as a substitute teacher at Bearfield. The District, however, presented evidence that King was hired specifically to provide one-on-one instruction to H.S. and that King's successful work with H.S. allowed him to be moved into Ryan's regular classroom. After H.S. was moved to Ryan's classroom, the reason for King's employment ended. This is a legitimate nondiscriminatory reason for Hardesty's decision.

King claims the District's reason is pretext and the real reason for her termination was not that she was without a student but that Hardesty "didn't need or want an educated African-American woman over at Bearfield who had asked him not to make racial remarks and questioned him on how he was treating African-American students over at Bearfield." [Opp. at 97.] To support her contention, King attempts to create a disputed issue of material fact by citing her deposition transcript in which she repeats statements made by Ryan to her that Ryan was not a certified teacher and that H.S. was moved into her classroom to help her acquire certification. Such statements constitute inadmissible hearsay and cannot be considered to prove that Hardesty's decision was racially motivated.

Moreover, these statements are being introduced to show that Hardesty falsely claimed that H.S. was ready to move into Ryan's classroom. Nowhere has King presented evidence that H.S. was not ready to move into the classroom. King argues that if H.S. were ready to be moved into Ryan's classroom, King would have been told because she was H.S.'s primary instructor, but the fact that a student's primary instructor

16

was not told that her student would be transitioned into a new classroom is not evidence that the student was not ready for the transition. It might be evidence of a communication oversight, but it is not evidence that H.S. was not ready to be transferred. Absent evidence that H.S. was not ready to be moved to Ryan's classroom, King cannot show the District's stated reason for terminating her employment is pretext for race discrimination.

Finally, because Hardesty gave King a job in the summer of 2001, there is a strong inference that he did not discriminate against her when he transferred H.S. into Ryan's classroom. *See Herr v. Airborne Freight Corp.*, 130 F.3d 359, 362-63 (8th Cir. 1997). Therefore, the District's motion is granted with respect to this issue.

### c. Denial of Homebound Instructor Assignments

King asserts that the District denied her homebound instructor assignments after December 7, 2001 because of her race. During the 2001 to 2002 school year, Hardesty, either personally or via his secretary, assigned homebound instructor hours for the District. During the fall of 2001, he assigned homebound instruction jobs to King. After King's job with H.S. ended on December 7, 2001, King did not receive any homebound assignments from Hardesty.

*December 7, 2001 - Beginning of 2002-2003 School Year.* To survive summary judgment on this aspect of her claim, King must produce some evidence that would allow the inference of improper motivation. Thus, King must produce some evidence that suggests Hardesty did not assign King homebound hours because she is African-American.

17

Hardesty hired King in the summer of 2001, gave her homebound instruction assignments during the fall, and then ended her employment on December 7, 2001. Because Hardesty gave King homebound hours prior to December 7, 2001, and hired her to work one-on-one with H.S., there is not sufficient evidence for a jury to find that he stopped giving her assignments because of race. "There is a strong inference that discrimination was not a motivating factor if the same person hired and fired the plaintiff within a relatively short period of time." *Herr v. Airborne Freight Corp.*, 130 F.3d 359, 362-63 (8th Cir. 1998). Other than stray remarks in the workplace, King has offered no evidence to counter the strong inference that race was not a motivating factor in Hardesty's decision to fire King. Therefore, King has failed to prove her prima facie case with respect to homebound instructor assignments from December 7, 2001 to the beginning of the 2002-2003 school year.

*Beginning of 2002-2003 School Year through October 2005.* To survive summary judgment on this aspect of her claim, King must submit evidence that she applied and was qualified for homebound instructor assignments. *Satz v. ITT Financial Corporation*, 619 F.2d 738, 746 n. 13 (8th Cir. 1980) (noting that "a prima facie case of discrimination is established where it is shown that a member of a protected group was qualified for a job, applied for the job and was rejected, and that the employer continued to entertain applications for the opening"). Beginning with the 2002-2003 school year, anyone who was not a student's teacher was required to submit an application to become a homebound instructor.

18

King has submitted evidence that she applied and was qualified for homebound hours for the 2001-2002 school year, but has not submitted evidence that she applied for homebound hours for any years thereafter. *Wright v. Stone Container Corp.*, 524 F.2d 1058, 1063 (8th Cir. 1975) (upholding district court's finding that plaintiff failed to apply for job where the only evidence offered was the plaintiff's own testimony).

King disputes that homebound instructors were required to reapply each year. In support of this argument, King references a mass of exhibits that seem to be portions of employees' personnel files. King does not explain how the referenced exhibits support her contention that homebound instructors were not required to reapply each year. *Howard v. Columbia Public School Dist.*, 363 F.3d 797, 800 (holding that once the moving party demonstrates that there is no issue of material fact, "[t]he plaintiff may not then simply point to allegations made in her complaint but must identify and provide evidence of specific facts creating a triable controversy[,]" which is not accomplished by "[s]imply providing a massive record" for the court to search (quotation omitted)); *Godfrey v. Pulitzer Pub. Co.*, 276 F.3d 405, 412 (8th Cir. 2002) ("In order to survive a motion for summary judgment, the non-moving party must be able to show sufficient probative evidence that would permit a finding in his favor on more than mere speculation, conjecture, or fantasy.").

No reasonable jury would conclude that King was not required to apply for homebound instructor assignments after the completion of the 2001-2002 school year. Because King failed to apply for homebound hours, she has not established a prima facie

case for the years beginning with the fall of 2002.

Summary Judgment is granted for Defendants on King's claim that she was denied homebound instruction hours because of her race.

### d.    Denial of Substitute Teaching Assignments

King asserts that the District denied her substitute teaching assignments from the spring of 2002 through October 31, 2005, because of her race. Within this assertion, King makes two distinct claims: (1) she was excluded from the substitute teacher list for the 2003-2004 school year because of her race, and (2) that, even when on the list, she was denied substitute teaching assignments because of her race.

King has established that in order to substitute teach, one must be on the substitute teaching list, which is controlled by Laffey. Once on the list, substitute teachers are offered assignments via telephone. Substitute teachers may also affirmatively check for assignments by calling a specified telephone number.

King states that she was excluded from Laffey's list for the 2003-2004 school year. In support of her contention, King only submitted the "All Substitute List" spanning August 19, 2003 to September 12, 2003. However, it is undisputed that King worked 28 days as a substitute teacher during the 2003-2004 school year. Given that a person must be on the list in order to substitute teach, any reasonable jury must conclude that King was included on the 2003-2004 list at some point during the school year. Therefore, the only basis for King's claim relates to her absence from the list between August 19, 2003 and September 12, 2003.

20

The Court evaluates King's claim that she was excluded from the substitute list from August 19, 2003 to September 12, 2003 under the "failure to hire" rubric. To satisfy her failure to hire prima facie burden, King must prove that (1) she is a member of a protected class, (2) she was qualified for substitute teacher positions, (3) she was denied the positions, and (4) the District hired someone from outside King's protected class. *Arraleh v. County of Ramsey*, 461 F.3d 967, 975 (8th Cir. 2006). Given this low threshold, the Court finds that King has established a prima facie case of race discrimination on her claim that she was excluded from the substitute list from August 19, 2003 to September 12, 2003.

The District contends that King was removed from the substitute list because of her behavior and exclusion from seven schools. After being removed from the list, King met with Laffey. As a result of the meeting, Laffey gave King a second chance and instructed Pauley to allow King to substitute teach in the elementary schools so long as no additional complaints were filed against her.

King argues that the District's purported reason for excluding her from the list is pretext because Caucasians, including Lisa Hackett and Shirley Forester, were kept on the substitute teacher list despite being excluded from more than seven schools. King, however, has not submitted evidence that the complaints about her were identical, or even similar, to those made about Hackett, Forester or anyone else. The quality of complaints would make a significant difference in deciding whether there was sufficient similarity between King and these Caucasian substitutes to raise an inference of discrimination.

21

The simple fact that Caucasians were excluded from schools, but continued to be on the

substitute teacher list, does not establish that the District's reason for excluding King

from the substitute list from August 19, 2003 to September 12, 2003 is pretext for race

discrimination. *Chock v. Northwest Airlines, Inc.*, 113 F.3d 861, 864 (8th Cir. 1997) ("[A]

comparison that reveals that the plaintiff was only similarly qualified or not as qualified

as the selected candidate would not raise an inference of racial discrimination.").

Therefore, summary judgment is granted on this claim.

The Court evaluates King's claim that she was denied substitute teaching

assignments even while on the list under the familiar Section 1981 race discrimination

rubric previously described. King has satisfied the first three prongs of her prima facie

case. The fourth prong requires King to submit some evidence that an improper factor

motivated the District's decision to limit her substitute teaching assignments. King,

however, has not identified the individual who decides whether a particular substitute

teaching assignment is offered to a particular name on the list.[6] *Jones v. Frank*, 973 F.2d

673, 676 (8th Cir. 1992) ("[D]iscrimination may be proved by inference, but such proof

requires identifying a relevant actor who has, by inference, discriminated."). Without

knowing the identity of the decision maker, the Court is unable to determine if an

improper factor motivated the decision to limit King's assignments.

In addition, King has not submitted evidence that she was treated differently than

_____

[6] Except for time between August 19, 2003 and September 12, 2003, there is no evidence
that King was off the substitute list.

22

any other person on the list. The evidence King has submitted shows that persons not belonging to her protected class were excluded from schools but still received more assignments, and thus, more pay than her. Without more, this fact evidences nothing with respect to why King's assignments were limited. King could have established an inference that she was denied assignments because of her race by submitting evidence that these Caucasian substitutes were assigned substitute teaching jobs at schools from which they were excluded. Alternatively, King could have established the inference by submitting evidence that Caucasians were given specific assignments which were not offered to her but for which she was eligible and available to accept. She has done neither. Therefore, for any period of time that King was on Laffey's list, King has not established a prima facie case of discrimination.

### B. King's Hostile Work Environment Claim

To establish a hostile work environment based on her race, King must prove that: (1) she was a member of a protected group; (2) she was subjected to unwelcome race-based harassment; (3) the harassment was because of her race; (4) the harassment affected a condition, term or privilege of her employment; and (5) her employer knew or should have known of the harassment and failed to take prompt and effective remedial action. *Diaz v. Swift-Eckrich, Inc.*, 318 F.3d 796 (8th Cir. 2003).

For King's work environment to be actionable it must be objectively hostile to a reasonable person and subjectively hostile to King. *Sallis v. Univ. of Minn.*, 408 F.3d 470, 476 (8th Cir. 2005). The conduct at issue "must be extreme and not merely rude or

unpleasant." *LeGrand v. Area Resources for Community & Human Servs.*, 394 F.3d 1098, 1101 (8th Cir. 2005); *Sallis*, 408 F.3d at 477 (holding that "rude" or "insensitive" conduct is insufficient to support a claim for hostile work environment). To determine if a work environment is hostile or abusive, courts consider "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Sallis*, 408 F.3d at 477 (citing *Elmahdi v. Marriott Hotel Servs., Inc.*, 339 F.3d 645, 653 (8th Cir. 2003)).

King claims her work environment was hostile as a result of Hardesty's and Wilkinson's racially insensitive comments. She also claims a hostile work environment because her work conditions were physically threatening, in that she was assaulted by H.S., and discriminatory, in that she was denied computer access and keys to the office.

### 1.     Hardesty's and Wilkinson's Comments

According to Eighth Circuit precedent, Hardesty's and Wilkinson's comments do not constitute a hostile work environment. The comments, though racially-charged and inappropriate, were isolated in nature and insufficient to constitute severe or pervasive harassment. *See Duncan v. General Motors Corp.*, 300 F.3d 928, 931 (8th Cir. 2002) (holding that fellow employee's "boorish, chauvinistic, and decidedly immature" conduct did not constitute a hostile work environment); *Klein v. McGowan*, 198 F.3d 705, 709 (8th Cir. 1999) ("Simple teasing, offhand comments, and isolated incidents generally cannot amount to severe or pervasive harassment."); *Scusa v. Nestle U.S.A. Co.*, 181 F.3d

24

958 (8th Cir. 1999) (more than a few isolated incidents are required).

## 2. King's Work Conditions

King argues that her work conditions constitute a hostile work environment. Specifically, King claims the conditions were (1) physically threatening and (2) discriminatory.

Physically threatening discriminatory conduct may lead to an actionable hostile work environment claim. *Sallis*, 408 F.3d at 477. In this case, the physically threatening conduct of which King complains is that of her student, H.S. King has not claimed that any of the District's discriminatory conduct was physically threatening. Accordingly, the fact that H.S. hit King does not make a submissible hostile work environment claim against the District.

King asserts that the District's denying her a computer and computer access, a password, and keys to the office where the copy machine was located constitutes discriminatory working conditions sufficient to sustain a hostile work environment claim. The Court disagrees. The District maintains that computer passwords could be requested via an on-line form, which King never utilized. Even if King was improperly denied computer access and a password and keys to the office, such wrongs do not satisfy the high threshold of harm required to maintain a hostile work environment claim. *Elmahdi*, 339 F.3d at 653 (holding that workplace must be permeated with discriminatory intimidation, ridicule and insult in order to satisfy the high threshold of actionable harm).

## C. King's Retaliation Claims

### 1. Prima Facie Case

To establish a prima facie case of retaliation, King must show that (1) she engaged in protected activity, (2) she suffered an adverse employment action, and (3) a causal connection exists between her engagement in the protected activity and the adverse employment action. *Kiel v. Select Artificials, Inc.*, 169 F.3d 1131, 1136 (8th Cir. 1999). The Court applies the same *McDonnell Douglas* three-part burden shifting analysis to King's retaliation claims. *Eliserio v. United Steel Workers of America Local 310*, 398 F.3d 1071, 1078 (8th Cir. 2005).

King asserts that she engaged in protected activity when she complained on numerous occasions during the fall of 2001 about Hardesty's inappropriate comments and discrimination at Bearfield. She also made similar reports in February 2002, the summer and fall of 2003, and in her August 20, 2005 letter.

King asserts that she suffered the following adverse employment actions: (1) King was not paid the salary of a long-term substitute teacher; (2) King was terminated from her position as a substitute teacher at Bearfield; (3) King was denied fellowship opportunities; (4) King was not hired for home school communicator positions; (5) King was denied homebound instructor assignments; and (6) King was denied substitute teaching assignments.

The District claims that it had legitimate non-discriminatory reasons for its actions. For purposes of summary judgment, the Court will assume that King has established a prima facie case and will only consider the District's legitimate non-discriminatory

26

reasons for its actions.

### 2. Legitimate, Non-Discriminatory Reasons and Pretext

#### a. Long-Term Substitute Salary

Assuming King has proved her prima facie case that the District did not pay her the salary of a long-term substitute in retaliation for her engaging in a protected activity, King must still refute the District's legitimate, non-discriminatory reason for its action. As set forth in section II(A)(2)(a), the District has produced evidence that King was not qualified to receive long-term substitute pay. King has offered no evidence to the contrary. Accordingly, King has not refuted the District's legitimate reason for not paying her as a long-term substitute. Summary judgment is granted on this issue.

#### b. King's Termination

As in the previous section, assuming King has proved her prima facie case that the District terminated her employment in retaliation for her engaging in a protected activity, King has, again, failed to refute the District's legitimate reason for its action. As set forth in section II(A)(2)(b), the District has produced evidence that King's employment was terminated because the one student she had been hired to teach was moved into a regular classroom. King has offered no evidence that the student was not ready to be transitioned to a regular classroom, nor has she submitted evidence that she was terminated for another reason. Therefore, summary judgment is granted on this issue.

#### c. Fellowship Opportunities

King asserts that she was denied a fellowship opportunity at Columbia College in

retaliation for reporting her concerns about Hardesty to Laffey in February 2002. During that conversation with Laffey, and after engaging in protected speech, King informed Laffey that she would like to be considered for a fellowship to become a certified teacher. Laffey sent King to Columbia College. At the college, King learned the fellowships were only for people who the District was going to hire. When King returned to speak to Laffey, she was informed that the District would not hire her. In 2003, King once again asked to be considered for the fellowship program only to have her request denied.

The District has offered ample evidence of non-discriminatory reasons why King would not be hired as a fully certificated teacher. Numerous complaints were levied against King as a result of her substitute teaching. These complaints included that, in January 2002, King had a "run in with a social worker intern in front of the students" and that King seemed power hungry. Complaints received between February 2002 and 2003 showed that King overstepped her bounds by calling parents, never asked for permission before she did anything, inappropriately confronted fellow teachers and staff, told students at one school that they would get Hepatitis from the drinking water, and told students that their regular teacher was pregnant when she was not. Based on these and other complaints, several schools prohibited King from substitute teaching at their school.

Laffey had a legitimate, non-discriminatory reason to deny King a teaching position in February 2002 and in 2003. Furthermore, King has failed to establish the causal prong of her retaliation claim because she has failed to show that she would have gotten a fellowship, a matter ultimately controlled by Columbia College. Therefore,

28

summary judgment is granted on this issue.

### d. Home School Communicator Positions

King asserts that the District denied her home school communicator positions in 2002-2003, 2003-2004 and 2004-2005 in retaliation for King's protected speech. It is undisputed that home school communicator positions were filled during these three school years. The District indicates that, with respect to one of the positions during the 2003-2004 school year, King was not hired because she was excluded by the particular school. The District also notes that King was not hired as a home school communicator because the District did not want to reward King's bad behavior with a full-time position.

For her part, King submitted double hearsay evidence that Laffey was "upset with King . . . because she was speaking out against [the District]" and that Laffey indicated that "because King was too assertive [and too] aggressive . . . King would never be hired as a permanent employee." [Pl's SOF ¶ 78.] Because this evidence constitutes inadmissible hearsay, the Court, pursuant to Fed. R. Civ. P. 56, will not consider it. *Miller v. Solem*, 728 F.2d 1020, 1023-24 (8th Cir. 1984) (holding that nonmovants must comply with Rule 56(e)).

King has only submitted evidence that, on March 15, 2002, Laffey indicated that she wanted King "deep-six[ed]." However, King has submitted no admissible evidence that Laffey's "deep-six" comment represents an intention to retaliate against King or that the comment is itself a retaliatory act. The term "deep six" does not inherently indicate a retaliatory animus. It conveys that Laffey did not want King hired but does not convey

29

the reason for her decision. As previously stated, Laffey had good reason to not employ King full time. Thus, King has failed to establish the causal prong of her retaliation claim. Furthermore, King has submitted no evidence of comparable bad behavior by persons who were hired as home school communicators. For all these reasons, King has failed to show that the District's stated reasons for denying her home school communicator positions are pretextual. Summary judgment is granted on this issue.

### e.  Homebound Instructor Assignments

King asserts that Hardesty denied her homebound instruction hours in retaliation for her complaining to Hardesty about his racially insensitive remarks and discrimination at Bearfield. As discussed in Section II(A)(2)(a)(I), King was required to apply for homebound instructor assignments following the 2001-2002 school year and failed to do so. Therefore, King cannot survive summary judgment for any claim based on the District's decision to deny her homebound hours during the 2002-2003 school year and for all years thereafter.

King also claims Hardesty denied her homebound instruction hours from December 7, 2001 through the end of the 2001-2002 school year in retaliation for her engaging in a protected activity. It is undisputed that Hardesty assigned King homebound hours prior to December 7, 2001. King asserts that she complained to Hardesty about his racially insensitive comments during the fall of 2001. King, however, has not submitted evidence detailing the specific dates of her homebound assignments or the specific dates of her complaints. If Hardesty assigned King homebound hours after she complained to

30

him, then her complaints cannot support an inference that her lack of hours after December 7, 2001 was caused by her pre-December 7, 2001 complaints. Also, because King has not been specific about the dates of her complaint, it is not possible to determine if temporal proximity is precluded by the gap in time between King's complaint and the time when she failed to get an available homebound instruction assignment.

King also complained about Hardesty to Laffey in February 2002 and to Ralph at some point in 2002. King has not established that Hardesty knew of these complaints. For these reasons, King's claim that Hardesty retaliated against her by not assigning her homebound hours from December 7, 2001 through the end of the 2001-2002 school year cannot survive summary judgment.

### f. Substitute Teaching Assignments

King asserts that the District denied her substitute teaching assignments from spring 2001 through October 31, 2005 in retaliation for her engaging in protected speech. Again, within this assertion, King makes two distinct claims: (1) she was excluded from the substitute teacher list during the 2003-2004 school year as a result of retaliation, and (2) that, even when on the list, she was denied substitute teaching assignments as a result of retaliation. King substituted 19 days during the 2001-2002 school year, 67 days during the 2002-2003 school year, 28 days during the 2003-2004 school year, 11 days during the 2004-2005 school year, and eight days during the 2005-2006 school year.

Incorporating herein its analysis in Section II(A)(2)(d), the Court finds that King has failed to establish a causal connection between her engagement in protected speech

31

and the proffered adverse employment action.  Thus, King has failed to prove her prima facie case.

Even if King had proved her prima facie case, she has not shown the District's reason for limiting her substitute teaching assignments was pretextual.  The District claims King was denied substitute teaching assignments because of her generally bad behavior and because she was excluded from seven schools and this limited the number of schools for which she could substitute.  According to the District, King was excluded from "two of three junior high schools and the largest high school in the state of Missouri, Hickman High School."  [Defs' Mot. at 23.]

In an effort to rebut the District's legitimate reason for denying King substitute assignments, King provided evidence that Laffey wrote in her notes after a September 4, 2003 meeting with King that King was "aggressive, assertive" and "if any exclusions, we are done."  And, on September 5, 2003, Pauley wrote that "[Laffey] talked with [King] and told me to give her a chance in elementary schools and the first time I receive a complaint she's out.  I am not to use her again."  These comments, however, are perfectly consistent with the District's position that King was denied substitute teaching opportunities because of the quality of her work.  The day after King's September 4, 2003 meeting with Laffey, Laffey instructed Pauley to give King a second chance.  Such behavior is inconsistent with retaliation.

King also claims the District retaliated against her for her August 20, 2005 letter to Pauley, which was sent to Dr. Chase and Laffey.  In that letter King complains that she is

being discriminated against on the basis of her race. After mailing the letter to Pauley, King worked seven of the next 46 days. The previous year, King worked only 12 of the approximately 175 days in the school year. After King sent her August 20, 2005 letter, the frequency of her substitute teaching assignments increased as compared with the prior year. This is inconsistent with retaliation.

The Court acknowledges that King wanted more substitute teaching assignments than she received. However, the Court is not charged with evaluating the appropriateness of the District's substitute teacher assignment policy. *Henderson v. Ford Motor Co.*, 403 F.3d 1026, 1034 (8th Cir. 2005) (federal courts do not have "authority to sit as super-personnel departments reviewing the wisdom or fairness of the business judgments made by employers, except to the extent that those judgements involve intentional discrimination").

King has failed to rebut the District's legitimate, non-discriminatory reason for denying her substitute teaching assignments. Therefore, even if King had proved her prima facie case, summary judgment would be granted on this issue.

### D.    King's Section 1983 Claims

In Count IV of her Complaint, King asserts a Section 1983 equal protection claim against the District and Hardesty, in both his official and individual capacities. With respect to King's equal protection claim against the District and Hardesty in his official capacity, the Court will grant Defendants' summary judgment motion to the same extent it has granted it on King's other claims. *Lockridge v. Board of Trustees of Univ. of*

33

*Arkansas*, 315 F.3d 1005, 1010 (8th Cir. 2003) (noting that employment-related equal

protection claims are analyzed under the same *McDonnell Douglas* burden-shifting

analysis as Section 198); *Bankhead v. Knickrehm*, 360 F.3d 839, 844 (8th Cir. 2004)

("Suits against public employees in their official capacity are the legal equivalent of suits

against the governmental entity itself.").

Similarly, with respect to King's equal protection claims against Hardesty in his

individual capacity, the Court grants summary judgment to Hardesty to the same extent it

has granted it on King's other claims against him.

Accordingly, summary judgment is granted on all of King's Section 1983 claims.

III.    **Conclusion**

Accordingly, it is hereby

(1)    ORDERED that Plaintiff's Motion to Strike Report of Calvin A. Keller,

       CPA [Doc. 65] is GRANTED;

(2)    ORDERED that Plaintiff's Motion to Strike Bobbie Pauley Affidavit

       Paragraphs 9 and 10 [Doc. 66] is DENIED;

(3)    ORDERED that Plaintiff's Motion to Strike Defendants' Exhibits

       Submitted with Defendants' Reply Brief in Support of Defendants' Motion

       for Summary Judgment [Doc. 86] is DENIED;

(4)    ORDERED that Defendants' Motion to Strike References to the

       Depositions of Hope Quaintance and Louis Gatewood in the Plaintiff's

       Memorandum in Opposition to the Defendants' Motion for Summary

Judgment [Doc. 70] is DENIED; and

(5)     ORDERED that Defendants' Motion for Summary Judgment [Doc. 53] is

GRANTED.


                                        s/ Nanette K. Laughrey
                                        NANETTE K. LAUGHREY
                                        United States District Judge


Dated:  November 21, 2006
Jefferson City, Missouri